**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. JKB-17-0163** |
| **RICKY EVANS, ET AL.** | |
| **Defendants** | |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**IN OPPOSITON TO DEFENDANTS' PRE-TRIAL MOTIONS**

The United States of America by its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and James T. Wallner and Clinton J. Fuchs, Assistant United States Attorneys for said District responds in opposition to the Defendants' Pre-Trial Motion.

**I.      FACTUAL AND PROCEDURAL SUMMARY OF THE CASE**

**A.      BACKGROUND**

The Black Guerilla Family (BGF), also known as the "Black Family" or "Jamaa," (the Swahili word for family, "J" for short) is a nationwide gang operating in prisons and on the streets of various cities throughout the United States.  Founded in California in the 1960s, BGF appeared in the Maryland correctional system in the 1990s.  Although still a prison gang, BGF is involved in criminal activity, including murder, robbery, extortion, narcotics trafficking, obstruction of justice, and witness intimidation throughout communities in Baltimore City, the State of Maryland, and elsewhere.

BGF's power and influence began in the prison system through control of the "jail economy."  BGF smuggled contraband and corrupted jail guards to solidify their influence.  BGF also extorted other inmates by forcing them to pay taxes for any contraband received or for protection from rival gangs or BGF.  If these non-BGF inmates refused to pay, they were assaulted.

Sometime prior to 2008, BGF began applying the paramilitary structure that allowed them to control the prison environment to the streets of Baltimore and other Maryland communities. As in the prison system, BGF organized its members into "regimes" or "bubbles" corresponding to particular regions or neighborhoods. These "regimes" or "bubbles" are organized and controlled by a hierarchy, called "the bubble," which consists of a "Commander;" "Lieutenant Commander;" various subordinate "Ministers," including Ministers of Justice, Defense, Education, and Finance; as well as other ranks. The remaining members of the regime are said to be in the "field" and are responsible for following the "directives" of the bubble.

BGF members are required to follow a code of conduct, sometimes called the "22's" and "33's" or collectively the "55's." This code of conduct includes the rules by which all BGF members are governed. BGF members who violate this code or who disobey a "directive" from a superior are subjected to disciplinary measures called "sanctions," which include fines, physical beatings, stabbings, and murders administered by other BGF members.

In 2009, the Drug Enforcement Administration (DEA) led the initial investigation of the BGF in Maryland, which resulted in the racketeering indictment and conviction of fourteen BGF members both in prison and on the streets of Baltimore (*United States v. Eric Brown, et al.* (WDQ-09-0183)). This investigation also demonstrated the incredible organizational reach of BGF and its efforts to consolidate its control of and involvement in varied criminal activity in the community, including drug trafficking, robberies, drug trafficking, and murders. The DEA-led investigation revealed the influence wielded by the BGF inside of various prisons and correctional centers, and the complicit relationships between the inmates and the guards. Further, the investigation showed a coordinated effort between non-incarcerated BGF members and incarcerated members to smuggle contraband into Maryland correctional facilities, intimidate

witnesses, traffic narcotics inside and outside of the Maryland correctional system, and to obtain bail and lawyers for fellow gang members

The sudden increase in BGF gang activity resulted in a tremendous amount of law enforcement resources being dedicated to counter BGF's growing influence, including the creation of the Maryland Prison Corruption Task Force, which was responsible for investigating and prosecuting prison-based criminal activities committed by inmates with the assistance of guards or other prison employees. This Task Force led to the second racketeering indictment against the BGF investigated by the Federal Bureau of Investigation (FBI) in 2013 (*United States v. Tavon White, et al*. (ELH-13-0151)). This case led to the conviction of nine BGF members and 25 correctional officers and employees of the Baltimore City Detention Center primarily for BGF racketeering activity inside of that facility.

Contemporaneously, with the FBI-led Task Force case, the DEA continued their investigation of BGF on the streets of Baltimore. Beginning in 2012, the DEA intercepted the communications of eight separate BGF members who were running various BGF regimes throughout Baltimore. In each instance, the DEA investigated a particular regime and utilized various charges to arrest the individual members, while attempting to minimize the exposure of the overall investigation. This "bubble approach" resulted in the conviction of eighteen BGF members, in separate indictments for drug trafficking, Hobbs Act robbery, and firearms violations, but none for racketeering (*United States v. Antoino Davis, et. al.*, (WDQ-13-002); *United States v. Shawn Jackson, et. al.*, (WDQ-13-0269); *United States v. Nathan Barksdale, et. al.*, (WDQ-13-0499); *United States v. Greyling Chase, et. al.*, (WDQ-13-0192); *United States v. William Barnett, et. al.*, (WDQ-13-0261); and *United States v. Michael Gwaltney, et. al.*, (WDQ-13-0133)). This approach developed cooperating witnesses, who explained the structure of the organization;

identified the hierarchy; identified individual acts of violence committed by BGF; and provided evidence against other members for a variety of criminal activity.

In 2013, the FBI, as part of a separate corruption investigation, identified another cooperating witness, who provided substantial information against BGF members and associates. Beginning with this individual during 2013 and 2014, the FBI intercepted the communication of another seven high-ranking BGF members and associates. Taken together, the 2012 DEA and 2013-2014 FBI wires formed the basis for another BGF RICO indictment, *United States v. Timothy Michael Gray* (JKB-14-0479).

The *Gray* case charged fourteen individuals with racketeering conspiracy. The Government convicted all fourteen defendants, three after a month-long trial. Gray, at the time of his arrest, was the highest-ranking member of the BGF on the streets of Baltimore, and had a hand in almost all BGF activity on the west side of Baltimore.

**B.    FBI WIRETAPS – INTERCEPTION OF SHAWN THOMAS**

The FBI's investigation into Gray included the interception of his wire and electronic communication over two of his cellular telephones from December 20, 2013 through March 2, 2014, and again from March 27, 2014 through May 18, 2014.

The interceptions confirmed his role within BGF, and captured him giving orders, settling disputes, middling drug deals and collecting gang dues among the various BGF regimes throughout Baltimore. The interceptions also identified many BGF members controlling regimes throughout Baltimore City.

The FBI intercepted Thomas over Gray's telephone and identified him as ranking member of BGF in control of a regime near the intersection of 27th Street and Greenmount Avenue in Baltimore City. The agents intercepted calls of Thomas collecting BGF registration dues from the

members of his regime and providing it to Gray.  In addition, intercepted calls indicated that Gray obtained crack cocaine at a discount from members of Thomas's regime, and attempted to do so with Thomas.  Gray then passed that discount onto other BGF members, but tacked on a service charge for middling the deal, and/or kept a small portion of the cocaine for himself.

While the Gray investigation resulted in multiple arrests, the Government declined to indict some identified members, including Shawn Thomas

### C.    ATF INVESTIGATION OF THOMAS

In addition to the FBI, the Bureau of Alcohol Tobacco Firearms and Explosives (ATF) also investigated Thomas.  During their unrelated investigation of a violent BGF drug shop in the area of the 27th Street and Greenmount Avenue, the ATF made several controlled purchases of drugs from Thomas, as well as a controlled purchase of a firearm.  Based upon these purchases, the Baltimore Police (BPD) obtained an arrest warrant for Thomas.  On August 12, 2016, the BPD detectives, who swore out the warrant, arrested Thomas in the 2600 block of Greenmount Avenue.  During a search conducted incident to that arrest, the detectives recovered 38 clear jugs of crack cocaine from a plastic bag hidden inside of Thomas's waistband.

### D.    ATF WIRETAP – INTECEPTION OF EVANS

The ATF also investigated Evans in July of 2015 because of his chance arrest along with several other BGF member inside the offices of *Safe Streets*, a community-based anti-violence initiative.  Detectives searched the location after a report of a robbery in the area, and individuals going in and out of the *Safe Streets* offices in close proximity to the time of the robbery.  For years, law enforcement believed that BGF used the *Safe Streets'* offices as a "safe house" to conduct meetings regarding gang activity.  *Safe Streets* or other anti-violence initiatives employed several defendants from the previous BGF prosecutions.  In this particular case, law enforcement arrested

Evans and other identified BGF members after officers seized seven firearms, drugs and drug paraphernalia from inside the *Safe Streets* office.  Because of the connection to firearms, ATF took the lead in the investigation and connected several of the recovered firearms to acts of violence, including homicides and shootings.

The Baltimore Police (BPD) also executed a search warrant at 3862 Twin Lakes Court, the registered address for car parked outside of *Safe Streets* following the robbery.  Evans's wife, Towanda Eason-Evans, lived at this address, and the car was registered in her name at that location. Detective Daniel Hersl was the affiant for the warrant, but a Baltimore Police Sergeant and FBI Task Force Officer Joseph Landsman can attest to each fact in the warrant.  Detectives recovered gang paperwork from inside of the Twin Lakes location.

Eventually, the state dismissed all of the charges associated with items recovered from inside of *Safe Streets* because of an insufficient nexus between the contraband and the defendants, but not before Evans spent several months in pre-trial detention.   While in pre-trial detention, Evans made several incriminating phone calls, which allowed ATF to identify phone numbers of Evans's family and friends.  By conducting a common call analysis of Evans's family members, after his release, law enforcement identified Evans's new phone, and began intercepting his wire and electronic communication in November of 2016.

The interceptions of Evans's phones provided ample evidence of Evans's participation in drug trafficking and gang activity.  ATF also determined that Evans sold drugs in Virginia and West Virginia to increase his profits.  Eventually, ATF arrested Evans at a relative's house in Richmond, Virginia (905 N. 20th Street), his base of operation for this Virginia and West Virginia drug trafficking, and recovered packaged and unpackaged heroin.  Additionally, agents searched Evans's addresses in Baltimore (5208 Loch Raven Boulevard, Apartment E, an apartment he

shared with his girlfriend Sherri Jordan) and recovered a stolen and loaded Bushmaster assault rifle, as well as heroin, and heroin packaging material; as well as his mother's house (408 East North Avenue), where agents recovered some paperwork.

## II.    FEDERAL CHARGES

On the same day as his arrest in Richmond (March 16, 2018), this Office charged Evans by criminal complaint with conspiracy to distribute heroin.  The ATF transported Evans from Richmond to Baltimore for his initial appearance, where he consented to detention.  During his transport to Baltimore, Evans and the transporting agents discussed his options regarding federal prosecution.  Evans admitted ownership of the drugs in the Richmond home, and did not deny his role in BGF, when asked about it.  On March 22, 2017, a federal grand jury returned an indictment charging Evans with conspiracy to distribute one kilogram or more of heroin, possession of a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm (Criminal Number JKB-17-0163).

From March of 2017 through February 2018, law enforcement continued its investigation into BGF and Thomas's and Evans's participation in the racketeering enterprise.  On February 22, 2018, a federal grand jury returned a ten count Superseding Indictment charging Evans and Thomas with *inter alia* conspiracy to participate in the affairs of a racketeering organization. Particularly, in Count One, the grand jury charged that from in or about 2010 until the date of the Superseding Indictment (February 22, 2018) Evans and Thomas participated in the affairs of BGF through a pattern of racketeering including, murder, kidnapping, extortion, robbery, drug trafficking, and witness intimidation.  In Count Two, the grand jury charged Evans and Thomas with a conspiracy to distribute controlled substances.  Counts Three through Seven charged Thomas with individual acts of distribution and possession with the intent to distribute controlled

substances.  Count Eight through Ten encompassed Evans's original indictment's drug and gun charges.

After the return of the Superseding Indictment, the Court issued an arrest warrant for Thomas.  On April 27, 2018, an FBI agent arrested Thomas after he exited an apartment at 1216 West Fayette Street in Baltimore City, and entered a vehicle.  After agents removed Thomas from the vehicle, they recovered a 9 millimeter handgun from his rear waistband.  Thomas stated to the arresting agents "you know why I'm carrying that," which the agent took mean that he had the gun for protection because he had been nearly fatally wounded in a shooting.

## III.    DEFENSE MOTION

The Court scheduled both defendants for trial on November 26, 2018, and scheduled hearings on any motions on October 19, 2018.  Each defendant filed motions to suppress evidence obtained from wiretaps (ECF #51 (Evans) and ECF #75 (Thomas)).  In addition, Evans filed motions to suppress the searches of 5208 Loch Raven Boulevard (ECF #49), and 905 N. 20th Street in Richmond (ECF #50).  Thomas filed motions to suppress the recovery of the gun from his person at the time of his arrest on April 27, 2018 (ECF #85), and the statements he made during the same incident (ECF #83).  Both defendants filed a motion to request that the government provide notice of Rule 404(b) evidence (ECF #81 (Evans) and ECF #84 (Thomas)), and Evans filed motions to sever his case from Thomas's (ECF #82), as well as to sever the individual counts of the original indictment (ECF #48).

## IV.    ARGUMENT

### A.    MOTION TO SUPPRESS WIRE AND ELECTRONIC INTERCEPTION

Both defendants filed motions to suppress the wiretaps (Evans (ECF #51) and Thomas (ECF #75)).  Interestingly, law enforcement intercepted the defendants as part of separate

investigations conducted by separate law enforcement agencies.    Despite these differences, both defendants argue separately that their wiretaps should be suppressed because: (1) the wiretap orders were based on affidavits that lacked probable cause; (2) the investigators failed to exhaust other investigative procedures; and (3) the monitoring agents failed to properly minimize calls.

### 1.    Chronology of the wiretaps for Gray

The FBI wire investigation into Mike Gray, and ultimately Thomas, began as an investigation into the drug trafficking activities of Rodney Terry.  Through the interception of Terry's phones, the FBI intercepted Gray, and from the interception of Gray, the interception of other BGF members, including Thomas, which the government notes the Court has previously ruled admissible in Gray's prosecution (JKB-14-0479).

On November 8, 2013, the Honorable George L. Russell III (Judge Russell) authorized the interception of wire and electronic communications over (410) 456-5149 (TARGET TELEPHONE (TT#1) used by Rodney Terry.  On December 6, 2013, Judge Russell authorized the continued interception of communications over TT#1.  Interception of TT#1 terminated on December 30, 2013.

Based on intercepts of Gray over Terry's telephone (TT#1), on December 20, 2013, Judge Russell authorized the interception of wire and electronic communications over (410) 624-6789 (TT#2), a telephone used by Gray.  Authorization for interception of TT#2 was continued on February 24, 2014, and was terminated on March 12, 2014 after Gray ceased using the phone.

On January 13, 2014, Judge Russell authorized the interception of wire and electronic communications over two additional phones used by Terry (410) 624-9759 (TT#3) and (302) 685-4104 (TT#4).  Interception began on January 13, 2014 and ended on February 11, 2014.

On February 24, 2014, Judge Russell authorized (1) interception of wire and electronic

communications over (703) 582-8723 (TT#5) and (2) over (404) 603-6887 (TT#6), both used by Glendrict Frazier; (3) the interception of wire communications over (443) 771-1362 (TT#7) used by Mark Bazemore; (4) the interception of wire communications over (404) 387-1152 (TT#8) used by Jameel Harrison; and (5) the interception of wire and electronic communications over (443) 991-3909 (TT#9) used by Robert Nedd.  Interception pursuant to Judge Russell's orders began on February 24 and 25, 2014.  Interception of TT#5 ended on March 12, 2014.

On March 25, 2014, Judge Russell authorized the interception of wire and electronic communications over (443) 379-6426 (TT#10), a telephone used by Irvin Vincent.  Interception began on March 25, 2014 and was terminated on April 1, 2014.

On March 26, 2014, Judge Russell authorized the continued interceptions over TT#6, 7, 8, and 9 and authorized the interception of electronic communications over TT#6 and 8.  Judge Russell also authorized the interception of wire and electronic communications over (443) 255-1257 (TT#11), another telephone used by Gray.  Interception of TT#6, 8, 9 and 11 began on March 26, 2014.  Interception of TT#7 began on March 27, 2014.  Interception of TT#8 was terminated on April 14, 2014, after Harrison was killed in a confrontation with law enforcement.  Interception of TT#6, 7, 9, 11 terminated on April 24, 2014.

Law enforcement intercepted Thomas only over TT#11.  Nevertheless, the fact that each affidavit for interception or continued interception builds on the probable cause and the investigation from the preceding lines, the Government will treat Thomas as having standing as to all lines leading up to TT #11.

### 2.    Chronology of Interception of Evans

As noted, the ATF began their investigation of Evans after his arrest inside of *Safe Streets* in July 2015.  On November 14, 2016, Judge Russell authorized the interception of wire

communication 443-764-1101 (TARGET TELEPHONE (TT#1)) used by Ricky Evans.   On November 30, 2016, Judge Russell authorized the interception of electronic communication over TT#1.  The Court authorized the continued interception of wire and electronic communications over TT#1 on December 13, 2016, January 6, 2017, and February 2, 2017.  Interception of TT#1 terminated on March 4, 2017, and was reauthorized on March 8, 2017 until it was terminated on March 21, 2017.

On January 6, 2017, Judge Russell authorized the interception of wire communication over 443-929-6723 (TT#2), used by Lamont Brown.  Interception of TT#2 never occurred because Brown ceased using it, but on January 20, 2017, Judge Russell authorized the interception of wire communication over 410-805-4765 (TT#3), Brown's replacement phone.  Interception of TT#3 terminated on February 19, 2017.

On February 17, 2017, Judge Russell authorized the interception of wire and electronic communication over 443-559-2284 (TT#4), used by Ricky Evans.  Interception of TT#4 terminated on March 19, 2018.

The Government can reasonably assure the Court that, as to Thomas, no interceptions from any line other than possibly TT#2 and #11 will be introduced during the Government's case-in-chief.  As to Evans, TT#1 and TT#4[1] were his phones, so most, if not all, of the conversations introduced will come from these two phones.  Accordingly, the Government has attached as Exhibit #1 to this response a compact disk containing the affidavits for TT#1[2], 2, and 5-11[3], and

---

[1]	Because the cases were investigated by separate law enforcement agency, and at different time, the numbering of the intercepted phones is duplicative.  The Government will identify Gray's phones as TT#, and Evans's phones as Evans's TT#, in an effort to alleviate confusion.

[2]	TT#1 is included because it was the first line intercepted and the first finding of probable cause by Judge Russell.  From TT#1, the Government developed the probable cause for TT#2 from which all other interceptions flowed.

[3]	Law enforcement intercepted five additional telephones as part of the investigation into Gray, which are unrelated to the prosecution of Thomas and are excluded from this response.

Evans's TT#1 and Evans's TT#4. Neither defendant has challenged the sufficiency of the application or orders (with the exception of minimization), so the Government has excluded the applications and orders from Exhibit #1, except for TT#2, and Evans's TT#1, which contains identical language to all other lines for the minimizations instructions ordered by Judge Russell. The Government has also included in Exhibit #1, a sample of the periodic court reports demonstrating the Government's compliance with the minimization instructions.

### 3. The affidavits in support of interception set forth ample probable cause

While both Evans and Thomas argue that the Government's affidavits in support of the various wires lack probable cause, neither, with the exception of a boiler plate recitation of the law, point to any deficiency in the Government's affidavits.

Title 18 of the United States Code section 2518(3)(a) provides that an application for a wiretap must contain facts establishing probable cause that an individual is committing, has committed or is about to commit one of the offenses enumerated in 18 U.S.C. § 2516. Section 2518(3)(b) states that a wiretap application must contain facts establishing probable cause for belief that communications concerning that offense will be obtained through interception. Section 2518(3)(d) provides that an application for a wiretap must contain facts establishing probable cause that: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; (2) that the target facilities are leased to or listed in the name of an individual believed to have committed an enumerated offense; or (3) that the target facilities are commonly used by an individual believed to have committed an enumerated offense.

The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants; for a wiretap order is a specialized sort of search warrant. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983).

It is axiomatic that such affidavits "must be tested and interpreted by magistrates in a common sense and realistic fashion . . . [t]echnical elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988). When an issuing judge makes a finding of probable cause, a reviewing court should not review that decision in "hypertechnical[ly], [but] rather [in a] common sense manner." *Ventresca*, 380 U.S. at 109. A reviewing court is not to substitute its judgment as to probable cause, but need only determine whether there was a substantial basis for the issuing court's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). "In applying for an order authorizing interception of electronic communications it is not necessary for the applicant to prove beyond a reasonable doubt that the communications concerning the offense will be obtained, but only that there is a fair probability thereof." *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991).

In analyzing a motion to suppress the wiretaps, two additional principles are important. First, the burden is on the defendant challenging the electronic surveillance to show illegality. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *see also* Fishman and McKenna, *Wiretapping and Eavesdropping*, §23.5 (party seeking suppression of evidence has the burden of proof by preponderance that the evidence was illegally seized). Likewise, the Supreme Court has held that in a close case a reviewing court should resolve doubts in favor of upholding a search warrant. *Ventresca*, 380 U.S. at 109; *see also United States v. Lofton*, 518 F. Supp. 839, 843 (S.D.N.Y. 1981), aff'd. without op., 819 F.2d 1130 (2d Cir. 1987).

The second principle is that the "determinations by an issuing judge are accorded

substantial deference" when reviewing wiretap orders. *United States v. McKinney*, 785 F. Supp.

1214, 1220 (D. Md. 1992). In *McKinney*, Chief Judge Black further explained:

> The function of this Court, which is essentially reviewing the previous findings of [the issuing judge], is "not to make de novo determinations of sufficiency as if it were [an issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made. *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir. 1977). *See also, United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) "Applications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.' . . . Assessments concerning probable cause are to be made after the 'totality of the circumstances' test has been used to determine the adequacy of the application." (citations omitted). "Where electronic surveillance has been authorized by a judicial officer, the fact that the issuing judge found probable cause is itself a substantial factor tending to uphold the validity of the order issued."

*Id. See also Depew*, 932 F.2d at 327.

Here, Judge Russell considered the totality of the circumstances and facts laid out in the

lengthy affidavits submitted and determined that there was probable cause that the persons sought

to be intercepted were engaged in racketeering and narcotics trafficking and that there was

probable cause to believe that evidence related to those offense would be obtained through

interceptions of the wire and electronic communications over the target cellular telephones.

The initial affidavit (TT#1) indicated that CS-1 made three controlled purchases of drugs

from Rodney Terry (Terry), the user of TT#1, see Exhibit #1(A) (Bates W1-027-30), after CS-1

contacted Terry over TT#1. By itself, that information established that Terry had used TT#1, was

using TT#1 and would continue to use TT#1 in furtherance of drug trafficking activities[4]. Once

the affiant established that information, a wiretap can be issued. Further, the fact that CS-1

completed the drug transactions established a track record upon which the judge could rely. After

probable cause was established to intercept TT#1, agents intercepted Gray over TT#2 discussing

drug activity with Terry on multiple occasion, thereby providing probable cause that TT#2 had

---

4       The initial enumerated crime listed for TT#1 was drug trafficking not racketeering.

been used, was being used, and would continue to be used in furtherance of criminal activity. Additionally, CS-1, who is a BGF member, knew Gray personally, and explained that Gray was a high-ranking member of BGF, *see* Exhibit #1(B) (Bates W2-030). Regarding TT#2, the Court was then able to rely not only on the intercepted drug conversations between Terry and Gray over TT#1, but also the assertions of CS-1, who had established a track record beginning, if no earlier, then the drug purchases to provide the probable cause for TT#1.

Similarly, Evans's TT#1 followed a similar pattern. First, while Evans was incarcerated, he used the recorded jail phones to conduct both drug and gang business. Second, multiple cooperating sources identified Evans as a drug trafficker and BGF member. Finally, after his release, Evans received a call from the jail, and over Evans's TT#1 arranged for a drug transaction for the incarcerated individual. Evans had, therefore, used and would likely continue to use Evans's TT#1 in furtherance of criminal activity.

### 4.   The affidavits in support of the wiretaps demonstrated that the exhaustion requirements under both 18 U.S.C. § 2518(1)(c) and 18 U.S.C. § 2518(3)(c) were met.

Both defendants claim that the affidavits established that other investigatory methods were being used and/or could have been used in lieu of a wiretap; therefore, the agents had not exhausted other investigative techniques before seeking a wiretap. In particular, Evans claims that the fact that the government did not use more sophisticated or technologically advanced surveillance techniques means that alternative investigative techniques were possible, and the government did not exhaust other investigative avenues. Thomas, like Evans, makes a similar claim arguing that the investigative techniques employed by law enforcement were in fact working, so a wire was unnecessary, and that the Government's affidavit is full of boilerplate language.

Title 18 of the United States Code section § 2518 (1)(c), provides in pertinent part that each

application for a wiretap shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518 (3)(c) provides that a judge may issue an order authorizing a wiretap if the application provides facts showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The Fourth Circuit has held that the appellate court owes "considerable deference" to the district court's determination that the exhaustion requirement of section 2518(3)(c) was satisfied. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994) (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination "considerable deference"). *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same). Accordingly, Judge Russell's determination that the exhaustion requirement was satisfied should be accorded the highest degree of deference.

Sections 2518 (1)(c) and (3)(c) of Title 18 were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Smith*, 31 F.3d at 1297; *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The Fourth Circuit has held that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that § 2518(1)(c) should not be read in an overly restrictive manner. *United States v. Leavis*, 853 F.2d 215, 221-22 (4th Cir. 1988). The Fourth Circuit has also repeatedly observed that, "[T]he burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a

showing is 'to be tested in a practical and commonsense fashion'...that does not unduly hamper the investigative powers of law enforcement agents." *Smith*, 31 F.3d at 1297 (quoting *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977)).

The Government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original); *Clerkley*, 556 F.2d at 709; *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all conceivable investigative procedures before seeking wiretap); *United States v. Bankston*, 182 F.3d 296, 306 (5th Cir. 1999) 306, *rvs'd on other grounds* (exhaustion of every conceivable investigative option need not be shown); *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (wiretap necessary to learn full extent of drug operation despite attainment of degree of success with traditional investigative methods).

The language of section 2518(1)(c) is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153, n.12, (1974).  "These procedures were not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974). At the same time, the purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974).  Nor does a wiretap need to be used only as a last resort. *United States v. Kerrigan*, 514 F.2d  35, 38 (9th Cir. 1975).  Rather, Congress intended that the showing envisioned by section 2518(1)(c) be tested "in a practical and common sense fashion." S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad.News, p. 2190.

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their training and experience as to whether a particular investigative technique will fail.  *See Smith*, 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents). Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail.  *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

Similarly, while the necessity determination may not rely *entirely* on boilerplate language, the fact that affidavits include assertions about some traditional investigative procedures that *are* boilerplate does not preclude the finding of necessity.  *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998).  Drug and gang investigations in particular, like the one here, suffer from common investigatory problems that lead to permissible boilerplate language in a wire affidavit.  Courts applying a commonsense approach recognize that experienced agents repeatedly run into the same problems in these types of investigations, and so necessity recitations that appear to be boilerplate more likely reflect the reality of the type of investigations rather than canned responses.  Here, each of the affidavits contained a detailed description of the alternative investigative techniques that had been tried and failed to achieve the objectives of the investigation; or appeared reasonably likely to fail if tried, or were likely too dangerous to use to achieve the objectives of the investigation.  Frankly, the list of investigative techniques that were exhausted is overwhelming. A review of each wire affidavit and / or extension contains references to the on-going investigation and specific reasons why certain techniques had been tried and failed, unlikely to succeed, if tried, or simply too dangerous to attempt.  With each successive affidavit, the affiants updated Judge Russell in the affidavit and court reports of the need for interception, and included *inter alia*

reference to problems associated with the use of: (1) prior electronic surveillance; (2) confidential informants; (3) undercover officers; (4) physical surveillance; (5) toll record analysis; (6) grand jury testimony; (7) search warrants; and (9) trash runs. *See e.g.* Exhibit #1(B) (Affidavit (Bates W2-037-46)); Exhibit #1(B) (Affidavit (1st Re-up) (Bates W2-120-130));  Exhibit #1(I)(Evans Affidavit TT#1 (Bates W-01-035-044)); Exhibit #1(J)(Evans Affidavit TT#1 (Bates W-01-0180-190)); Exhibit #1(K)(Evans Affidavit TT#1 (1st Re-up)(Bates W-02-43-054)); Exhibit #1(L)(Evans Affidavit TT#1 (2nd Re-up)(Bates W-03-036-047)); Exhibit #1(M)(Evans Affidavit TT#4 (Bates W-05-044-056)); Exhibit #1(I)(Evans Affidavit TT#4 (2nd Re-up) (Bates W-01-035-044)).

As the Ninth Circuit has noted in similar circumstances, "we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of main coconspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators." *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990). *See also Bennett*, 219 F.3d at 1122.  Similarly, in *Clerkley*, the Fourth Circuit held that even where there was probable cause to arrest four of the principals named in the wiretap orders, the Government was not precluded from carrying the investigation further. *Clerkley*, 556 F.2d at 714. The fact that BGF is a ubiquitous organization embedded in the very fabric of the criminal element in Baltimore, and the fact that multiple prosecutions, and investigative techniques, including other wiretaps (discussed above), have done little to curtail their activities serves to demonstrate the correctness of Judge Russell's determination that wiretaps were necessary to identify the members and extent of the racketeering organization.

### 5.    There Was No Violation Of The Court's Minimization Requirements.

Both defendants claim that the investigators failed to "minimize" the interception of

communications properly.  Evans, in particular, noted that many of Evans's calls appear to be

between girlfriends, family members, and friends arranging dinners, etc.

Title 18 of the United States Code section 2518(5) contains the minimization requirements

for a wiretap and reads, in pertinent part, as follows:

> Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon the attainment of the authorized objective . . . In the event the intercepted communication is in code or a foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.  An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

In this case, each of the orders authorizing the interceptions contained the same or similar

following language:

> . . . interception shall be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under 18 U.S.C. § 2510, *et seq.*.

> . . . special attention will be given to privileged communications, including by the use of spot monitoring of intercepted communications, and must terminate upon attainment of the authorized objectives, but not to exceed thirty days.  If an interception is minimized, agents shall spot check to ensure that the conversation has not turned to criminal matters.  Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature.  If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team.  If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team.  If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation.  If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team.  All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception.

*See e.g.* Exhibit #1(B) (Order (Bates W2-063-64)) and (I) (Order Bates W01-0062-63)). Therefore, a specific plan for minimization was both stated and ordered.

Further, while Evans makes grand statements regarding the level of intrusion into Evans's private life, he has failed to show one call that was improperly minimized.  Further, although they were not charged, Evans's family, including his son and girlfriend, were clearly conspirators, in Evans's criminal activity.  Even *if* the defendants were to point to a call or calls that should have been minimized but were not, the minimization requirement does not leave all innocent communications unheard.  The statute requires that unnecessary intrusions are to be reduced as much as possible but efforts at minimization must be reasonable under the circumstances and reviewed on a case-by-case basis when testing compliance. The Fourth Circuit indicated the rule for this circuit in *Clerkley*:

> In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed.

*Clerkley*, 556 F.2d at 716.

While *Clerkley* involved the investigation of illegal gambling, these same factors are applicable in a gang racketeering or narcotics conspiracy.  In *Clerkley* the Fourth Circuit observed: "When law enforcement officials are confronted with a large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps." *Id.* The Seventh Circuit, in considering a drug conspiracy, held that "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy." *United States v. Quintana*, 508

F.2d 867, 874 (7th Cir. 1975).

As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

[W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.

*Id* at 1300-01.

Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated. "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take." *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

The thoroughness of the Government precautions to bring about minimization, and the degree of judicial supervision over the surveillance practices, are both strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation. *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

With respect to the extent of judicial supervision, "[w]here the authorizing judge has required and reviewed ... reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *United States v. Armocida*, 515 F.2d 29, 44-45 (3rd Cir. 1975) (citing *United States*

*v. James*, 494 F.2d 1007, 1021 (D.C. Cir. 1974)); *see also United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997).

In this case, Judge Russell's orders authorizing the wiretaps required that the Government make periodic reports regarding the progress of the investigation.  *See* 18 U.S.C. 2518(6).  *See* Exhibit #1(B) (Order (Bates W2-065)) and (I) (Order (Bates W01-063)).  The Government submitted periodic reports as required.   These reports, *see e.g.* Exhibit #1(B) (Court Report 1 (Bates W2-067-77)); Exhibit #1(B) (Court Report 2 (Bates W2-153-160)); Exhibit #1(I) Evan's Court Report (Bates W01-65-76); an Exhibit #1(I) Evan's Court Report (W06-90-98), advised the judge of statistical data including the total number of activations, the number of pertinent calls, the number of minimized calls, and the number of calls greater than 2 minutes in length.  *See e.g.* Exhibit #1(B) (Court Report 1 (Bates W2-069)).  The reports also included descriptions of many of the pertinent calls, which provided Judge Russell with continuing probable cause to support the ongoing interceptions.   Every report ended with an authorization for Judge Russell to sign to confirm his review of the report and his agreement that continued interception was warranted. Accordingly, the degree to which Judge Russell supervised these wiretaps should inform the Court's assessment of the Government's reasonable efforts to minimize.  *See Eiland*, 398 F. Supp. 2d at 175.

Even *if* this Court were to find that there was a failure to minimize *some* of the calls, the remedy should not be the suppression of *all* the intercepted conversations.  *See United States v. Cox*, 462 F.2d 1293, 1301-1302 (8th Cir. 1972); *United States v. Sisca*, 361 F.Supp735, 746-747 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874-877 (E.D. N.Y. 1972). Rather, at most what should be suppressed are individual calls identified by one of the defendants, which the Court concludes should have been minimized but were not.

### 6.    A Wiretap is not a General Warrant

Thomas alone argues that the Government's applications and affidavits constituted a general warrant because the affidavit failed to designate any "authorized objectives" to serve on a check on law enforcement.  Despite this claim, each affidavit lists a set of stated objectives, for an example see Exhibit #1 (B)(TT#2 Affidavit (Bates W2-0021-22)) and (I) (Evans's TT#1 Affidavit (Bates W01-0020)), for the interception of communication, which include *inter alia* to identify "co-conspirator, accomplices, suppliers [of drugs];" to discern the "structure and organization of the racketeering enterprise;" and to intercept communication involving "acts of violence," "financing and distribution of controlled substances," and "the identification of other locations and facilities used in furtherance [of the enterprise]."  Further, each affidavit or periodic report was reviewed by Judge Russell, and he made the determination of whether continued interception was authorized.  The investigation did not wander aimlessly with no judicial oversight.  Rather, Judge Russell, with full knowledge of the stated objectives of the investigation, permitted the Government to continue to collect evidence against this far-flung criminal enterprise.

### 7.    Good Faith Exception Applies Even if Affidavits Found To Be Invalid.

Finally, it is clear that Judge Russell's wiretap orders complied with the requirements of the law.  As such, the affiants were entitled to rely on facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* has been applied to admit electronic surveillance evidence.  *See United States v. Brewer*, 204 Fed. Appx. 205 *3 (4th Cir. 2006) (unreported) (even if affidavit lacked probable cause or exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap order); *United States v. Moore*, 41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing

electronic surveillance). Therefore, even assuming, *arguendo*, that the affidavits were invalid the evidence may properly be received under the good faith exception to the exclusionary rule.

      **B.**      **The Motion for Severance Should be Denied.**

      Evans filed a motion to sever Count One of his original Indictment with Count Two and Three (ECF #48) and later filed a motion to sever his case from Thomas's (ECF #82) in the Superseding Indictment. Evans argues in his first motion that the drug conspiracy count (Count Two of the Superseding Indictment) should be severed from the substantive crimes of possession with the intent to distribute controlled substances and possession of a firearm in furtherance of a drug trafficking crime (Counts Eight and Nine of the Superseding Indictment). In his second motion, Evans argues that his case should be severed from Thomas's because they are not charged with any of the same racketeering acts.

      **1.**      **The Joinder of Counts is Appropriate**

      Federal Rule of Criminal Procedure 8(a) permits joinder of separate offenses where "the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The Fourth Circuit "ha[s] interpreted the latter two prongs of this rule flexibly," requiring only that the joined offenses "have a 'logical relationship' to one another." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (quoting *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992). Such a relationship exists "when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." Id. at 385.

      "Rule 8(a) permits very broad joinder because of the efficiency in trying the defendant on related counts in the same trial." *Id*. Thus, the standard for joinder is not "onerous*," United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003), and "the general rule is that counts charged in the

same indictment will be joined at trial." *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992); *see also United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995) (noting that joinder is "the rule rather than the exception").

Here, the substantive crimes of possession with the intent to distribute controlled substances and possession of the firearm in furtherance of that crime are part and parcel of the overarching drug trafficking conspiracy. Further, and perhaps more importantly, all three of these crimes now constitute some of the racketeering acts alleged against Evans in Count One. The joined offenses tell the complete story of the overarching racketeering and drug trafficking conspiracy.

To sever the counts would force the Government and the Court to try the same case twice. Fact witnesses, wire calls, and seized evidence would be the same. The same agents would testify twice about the related charges. *See United States v. Blair*, 661 F.3d 755, 768-69 (4th Cir. 2011) ("[T]he prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses to should be tried in a single proceeding.") (internal citations and quotation marks omitted); *United States v. Cooper*, 134 F.3d 364 (4th Cir. 1998) (table) (noting that separated offenses may be joined if "the evidence supporting the separate counts overlaps so that the same evidence would be admissible at separate trials"). Joinder is therefore appropriate.

When joinder under Rule 8(a) is proper, as in this case, "the defendant's only recourse is to convince the court that the charges should be severed under Rule 14, a difficult task." *United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (citing Cardwell, 433 F.3d at 387) (noting that incidents where joinder of offenses is proper but severance is nevertheless required is limited to "rare" case where joinder would "prevent the jury from making a reliable judgment about guilt or

innocence"). "A defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted).

In this case, evidence of the defendant's drug trafficking conspiracy, substantive drug trafficking charges and weapons violations would all be admissible in the all-encompassing racketeering conspiracy. In fact, the incidents of drug trafficking and weapons possession are racketeering acts in the RICO conspiracy. Given this circumstance, there is little concern of prejudice to Evans because the evidence for each crime would otherwise be admissible in the racketeering conspiracy.

### 2. Evans Has Not Met the Burden of Showing Prejudice Sufficient to Justify Severance.

Evans bears a similar burden in trying to sever his case from Thomas. Rule 14 of the Federal Rules of Criminal Procedure provides in part that, "[i]f it appears that a defendant or the government is prejudiced by joinder of offenses or of defendants . . . . the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires." Generally speaking, however, "when defendants are indicted together, they should be tried together," *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012), particularly where a conspiracy is charged, *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983). As the Supreme Court has explained:

> There is a preference in the federal system for joint trials of defendants who were indicted together. Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. For these reasons, we repeatedly have approved of joint trials.

*Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal citations and quotation marks omitted).

The Courts of Appeal review the denial of a motion to sever for abuse of discretion and "will not reverse a denial of a motion to sever absent a showing of clear prejudice." *Dinkins*, 691 F.3d at 367-68; *see also United States v. Smith*, 451 F.3d 209, 219 (4th Cir. 2006) ("Assuming that a joinder of two or more defendants for trial was proper in the first instance, we will not overturn the trial court's denial of a severance motion, unless an appellant can show that the joint trial resulted in a "miscarriage of justice").

The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995). Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion. *Zafiro*, 506 U.S. at 538.

As noted, there is a well-settled preference in the federal system for joint trials of defendants who are indicted together. *Id.* at 537. Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992). Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions. As a result, claims of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

As an initial matter, it is important to note that the defendants in this case were properly

joined pursuant to Federal Rule of Criminal Procedure 8(b). Specifically, the defendants are charged in the same racketeering conspiracy, and drug trafficking conspiracy, and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, because much of the evidence presented by the government in its case-in-chief will pertain to all defendants. *See, e.g., Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."). Accordingly, the presumption in this case is that all of the defendants should be tried together.

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539. There is no such risk in this case. Neither defendant alleges irreconcilable defenses such that one defendant's claim of innocence depends upon a co-defendant's guilt. *See id.* at 538. The defendants are roughly evenly matched in terms of their culpability; both are alleged to have committed both drug trafficking offenses and violent crimes in furtherance of a racketeering enterprise, and they are both alleged to be "bush members" of the enterprise – an equal rank. Although the defendants operated in separate spheres of BGF, they played similar roles in the charged conspiracy, any risk of prejudice from perceived differences in their levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions." *Zafiro,* 506 U.S. at 539; *see also United States v. Brugman,* 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to

another."); *United States v. Baker,* 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), *cert. denied,* 513 U.S. 934 (1994).

Here, Thomas acted as a "bushman" in charge of a BGF regime in the area of 27th Street and Greenmount Avenue in Baltimore.  Evans, another "bushman," controlled several regimes south and east of Thomas's location, but still within the confines of Baltimore City.  A cooperating witness will testify that he obtained distribution quantities of drugs from both of them and interacted with both in their roles as high-ranking members of BGF.

> **3.      Any Potential Prejudice Suffered from the Presentation of Mutually Antagonistic Defenses or Disparities in the Strength of Evidence Can Be Cured by the Court's Instructions.**

Rather than the radical remedy of severance, courts have long favored limiting instructions to the jury.  *United States v. Cardwell,* 433 F.3d 378, 388 (4th Cir. 2005); *Najjar*, 300 F.3d at 475. Any potential prejudice suffered as a result of the joint trial can be addressed by the limiting instructions provided at trial.  "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."  *Zafiro*, 506 U.S. at 538-39.  Measures less drastic than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice."  *Id.* at 539.  *See id.* at 541 (instruction sufficed to cure any possibility of prejudice where district court instructed jury that the government had the burden of proving beyond a reasonable doubt that each defendant committed the crimes with which he or she was charged; the jury must give separate consideration to each individual defendant and to each separate charge against him; each defendant is entitled to have his or her case determined from his or her own conduct and the evidence applicable to him or her; and the arguments are not evidence and that no inferences should be drawn from a defendant's exercise of the right to silence); *Plato*, 629 F.3d at 651 ("Nothing in this paradigmatic case of blame-shifting

codefendants suggests a basis for severance.  Any possibility for prejudice was cured by the district court's instruction to the jury to consider each defendant separately.").

### C.    Motion Requiring Government's Disclosure of Evidence Pursuant to Fed. R. Crim. P. 404(b)

Both Defendants (Evans (ECF #81)) and (Thomas (ECF # 84)) moved to require the Government to disclose its intention to introduce evidence of other bad acts, 404(b) evidence, that the Government intends to offer into evidence.

First, this motion is premature. The Court's scheduling order (ECF #43) does not require motions in limine to be filed before October 29, 2018.  Further, the defendants are charged in an over eighteen-year, wide-ranging racketeering conspiracy.  Most "bad acts" during that timeframe would likely be considered overt acts of that conspiracy, and the Government likely will not seek the introduction of any act committed by any defendant outside that timeframe.

The Government notes, however, that the Fourth Circuit has held that "the mere fact that evidence involves activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes evidence.'"  *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994).  Indeed, "evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense or if it is necessary to complete the story of the crime on trial."  *Id.*  Accordingly, the Government reserves the right to present evidence of conduct by the BGF that predates the conspiracy to the extent that conduct arose out of the same series of transactions charged in the Superseding Indictment.  Should the Government reconsider this position, it will advise the Court and the parties.

Finally, Thomas mentions in his motion to suppress tangible evidence, his arrest and possession of firearm.  He argues that he has not been charged with the possession of that firearm. To the extent that his arrest and possession of a firearm after his indictment constitutes 404(b)

evidence, the Government will seek the introduction of that evidence at trial, and will likely charge the Thomas in a separate indictment prior to the trial.

In addition, the Government will seek the introduction of the firearms and drugs seized from *Safe Streets* in July 2015, which is within the timeframe of the alleged racketeering conspiracy. Several of the firearms were later matched through ballistics to other crimes. While neither of the defendants have been charged with any of the linked acts of violence, the Government will seek the introduction of those ballistic links. At least one witness will testify that he/she attended gang meetings at *Safe Streets*, and that *Safe Streets* is primarily staffed by BGF members. The witness will also testify that he/she has obtained drugs at that location and observed BGF members, including Evans, in possession of firearms there. The logical inference drawn from these facts is that the guns seized in July 2015 were guns possessed by BGF members and used in various acts of violence; that *Safe Streets* is used as a secure gang meeting location; and a place to logically store crime guns to avoid seizure by law enforcement. While this evidence seems intrinsic to the racketeering enterprise, to the extent that they are deemed "other crimes" evidence, the Government seeks its admission.

### D.    Motions To Suppress Physical Evidence

#### 1.    EVANS

Evans moved to suppress physical evidence seized from two locations, 5208 Loch Raven Boulevard, Apartment E, Baltimore, Maryland (ECF #49); and 905 N. 20th Street, Richmond Virginia (ECF #50). Evans advances the same boiler-plate arguments for each location, essentially stating that the probable cause to search the location was based on a deficient wiretap; that regardless, the warrant lacked probable cause; and was so deficient that no objectively reasonable magistrate should have authorized the warrant. Importantly, Evans does not allege any error or

omission in any of the warrants, nor has he produced an affidavit alleging a falsehood in any of the warrants necessitating a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978).

In analyzing a warrant, the test for probable cause is totality of the evidence, and reliability is only one factor among many the magistrate could consider. Once a search warrant has been issued, review of the probable cause determination by the judicial officer (usually a magistrate judge) is to be shown "great deference." *United States v. Blackwood*, 913 F2d 139, 142 (4th Cir. 1990). The reviewing court must limit its inquiry to asking "only whether the magistrate had a 'substantial basis...for concluding' that probable cause existed." *Id.*, (quoting, *Illinois v. Gates*, 462 U.S. 213, 238 39 (1983)). To find probable cause, the magistrate must simply "make a practical common sense decision whether, given all the circumstances in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *Massachusetts v. Upton*, 466 U.S. 727 (1984)(probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched."); *See also United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)(same). Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false."). The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002). "Only the probability and not a prima facie showing of criminal activity is

the standard of probable cause." *Blackwood*, 913 F.2d at 142, (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).  The task of the reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence on the record to support the decision of the issuing judge. *Upton*, 466 U.S. at 728.  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664.

The Fourth Circuit has consistently upheld "warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008).  In such circumstances, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the target address. *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005); *see also United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005) (recognizing "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence").

Here, as to each location, law enforcement presented a robust affidavit outlining ample probable cause to search each location.  As to the Loch Raven address, the Honorable Stephanie A. Gallagher, United States Magistrate Judge for the District of Maryland, authorized that search on March 2, 2017.  The affiant outlined the investigation into Evans's drug trafficking, his use of the address as his primary residence, and the use of the premise in furtherance of his drug activity.

A copy of the affidavit is attached as Exhibit #2. Similarly on March 15, 2017, the Honorable Roderick C. Young, United States Magistrate Judge for the Eastern District of Virginia authorized the search of the Richmond address. A copy of the affidavit is attached as Exhibit #3. As to the Richmond address, the affidavit outlined a very similar set of facts.

In each circumstance, agents advised the magistrate judges of cooperating witnesses, whom identified Evans as a member of BGF. The agents then explained Evans trafficked drugs as part of his participation in BGF, including specific calls demonstrating on-going drug trafficking activities, and then, as to each location, the agent outlined how Evans used each location as part of his drug trafficking activities. As to both locations, agents confirmed that Evans either entered or exited the locations in close proximity to what they believed were drug-related telephone conversation. As to each, a magistrate judge could then easily conclude that Evans kept the drugs, the proceeds, or both in the individual residences and authorize the search.

Even if there were deficiencies in the probable cause showing in the search warrant affidavits, the good faith exception would preclude application of the exclusionary rule. *See United State v. Leon*, 468 U.S. 897 (1984). As the Supreme Court explained in *Leon*, "The deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith within the scope of a search warrant issued by a magistrate.'" *United States v. Perez*, 393 F.3d 457, 461 (4th Cir.2004) (quoting Leon, 468 U.S. at 920). Accordingly, under Leon's "good faith" exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was "objectively reasonable." *Id.* (quoting Leon, 468 U.S. at 922, 104 S.Ct. 3405).

## 2.    THOMAS

Thomas moved to suppress the firearm seized from his person at the time of his arrest on April 27, 2018. Thomas appears to allege that the agents arrested him without a valid arrest warrant. The court, however, docketed the arrest warrant at ECF #56, which the Honorable A. David Copperthite authorized on February 22, 2017, the date the grand jury returned the Superseding Indictment against him. A copy of the arrest warrant is at Exhibit #4.

During the search of Thomas's person incident to his arrest, one of the arresting agents recovered a firearm from Thomas's rear waistband. A search incident to arrest - of the person and areas or containers within his immediate control – is a well-established exception to the warrant requirement. *See e.g., Michigan v. DeFillippo*, 433 U.S. 31, 35 (1979); *United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Currence*, 446 F.3d 554, 558-59 (4th Cir. 2006). Even where the warrant may be invalid, an agent's good faith reliance on the existence of the warrant would not undermine either the arrest or the subsequent search incident thereto. *See United States v. White,* 342 F.2d 379 (4th Cir. 1965).

Here, there is little doubt that the agents possessed a valid arrest warrant issued by a United States Magistrate Judge. In fact, the agents conducted an investigation into Thomas's whereabouts after the issuance of the warrant in order to effectuate his arrest.

The Court may, however, need to conduct a hearing to determine whether the seizure of the firearm was within Thomas's immediate control.

### E.    The Motions to Suppress Statements

During his arrest, Thomas volunteered that he possessed the gun because he had recently been shot. Thomas made this statement not in response to questioning by the agent, but in response to the agent's recovery of the firearm. Thomas now alleges that this statement was taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), in that he made this statement without first

being advised of his *Miranda* warnings.

*Miranda* warnings are required only when a subject is *interrogated* while in custody, *Miranda v. Arizona*, 384 U.S. 436 (1966). Once in custody and interrogated, any statements made to law enforcement must comply with the requirements of *Miranda* and the Due Process clause of the Fifth Amendment Statements. *Colorada v. Connelly*, 479 U.S. 157 (1986). *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). *Miranda* warnings are not required when a defendant volunteers information or blurts out a statement which is not made in response to "interrogation." *See id.* at 300; *United States v. Wright,* 991 F.2d 1182, 1186 (4th Cir.1993).

Here, while Thomas was definitively in custody – he had just been arrested, no questions were asked of him, and as such no interrogation occurred. Any inculpatory statement he made should, therefore, be admissible.

The Court will need to conduct a hearing to determine the admissibility of Thomas's statement to the agent.

### 1. Proffer-protected Statements

Following the arrest of the defendants, each defendant and their counsel was afforded the opportunity to participate in a "reverse proffer." During the reverse proffer, the Government provided some of the evidence against the individual defendant; played intercepted conversations; showed surveillance photos; etc.; and then explained the options to the defendant moving through

the trial process. Each defendant was then afforded the opportunity to speak to the Government under the protection of a proffer agreement. Some defendants did elect to speak to the Government and provided proffer-protected statements. Often, during these proffer sessions, the individual defendant made self-inculpating statements, but, in some most circumstances, inculpated the codefendant as well.

As a result if a defendant who provided a proffer-protected statement takes the witness stand during trial and is found to have violated their proffer agreement, it is possible that inculpating evidence against other defendants will be introduced. Presently, the individual defendant's proffer statements have not been provided to the codefendant, and will not be provided until a defendant elects to testify. Obviously, no *Bruton* issues would arise because the testifying defendant would be subject to cross-examination about his prior statement, but the Court should be aware of this possibility.

### F.    ANTICIPATED ADDITIONAL MOTIONS

#### 1.    EVANS

The Government only recently learned of the search warrant at Twin Lakes, which is attached as Exhibit #5. A convicted member of the Gun Trace Task Force (GTTF) swore out the warrant. While the Government anticipates that Evans would move for a *Franks* hearing on this matter considering the obvious issues associated with the affiant, a separate detective and member of the FBI Safe Streets Task Force can attest to the facts contained in the warrant. In fact, the warrant contains a concise set of fact, hardly in dispute. The warrant relies on no personal observation by the GTTF detective. Rather, the warrant outlines the arrest of Evans inside *Safe Streets* in July 2015; the recovery of firearms, the after the report of a robbery; the identification by the robbery victim that the vehicle outside of *Safe Streets* was used during the robbery. That

vehicle was registered to Evans's wife at the address that was searched. All the information contained in the warrant was known to other investigators, including TFO Joseph Landsman, prior to the warrant being sworn or executed.

At bottom, Evans would be hard-pressed to provide an affidavit showing any false or misleading information contained within the warrant sufficient to trigger a *Franks* hearing, despite the later issues associated with the affiant. The Government has not determined whether the introduction of the evidence will be made during the case-in-chief, but the Court should be aware of the possibility.

### 2.    THOMAS

Thomas did not move to suppress the 38 jugs of crack cocaine seized from him in August of 2016; however, after a brief conversation with defense counsel, Thomas would likely move to suppress those drugs on the same ground as the firearm recovered from him in August 2018. Similar to Thomas's 2018 arrest, the BPD possessed an arrest warrant for him, which is attached as Exhibit #6. Again, once law enforcement obtains a valid arrest warrant, an arrestee's person can be search to protect the arresting officer and preserve evidence.

Here, like in 2018, detectives found the drugs on Thomas's during a search conducted incident to his arrest.

The Court may, however, need to conduct a hearing to determine whether the seizure of the drugs was within Thomas's immediate control

## III.    <u>CONCLUSION</u>

For all of the above reasons, and other than those motions for which the Government has no objection, the Government respectfully requests that the Defendants' pre-trial motions be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:     _____/s/_____
James T. Wallner
Clinton J. Fuchs
Assistant United States Attorneys
36 S. Charles Street, 4th Fl.
Baltimore, Maryland 21201

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of October 2018, a copy of the foregoing

Government's Response to Defendants' Pre-Trial Motions was electronically filed with notice to

all counsel of record:


_____/s/_____
James T. Wallner
Assistant United States Attorney

41